Before I begin, I want to take a moment to welcome some members of the Air Force Judge Advocate General's Corps. Major Jeff Lorick, who is here with them, used to be an intern for me, or extern. I never know the difference. We called them externs in district court, and now we call them interns in the Court of Appeals. But it's good to see you again, and thank you for bringing all of your friends with you. And thank you all for your service. We have several cases before the Court this morning, four argued cases, as a matter of fact, three of which are patent cases, and one of which is an appeal from the Court of Federal Claims. The one issue that I want to address, and I'd like counsel to address when they stand up respectively, is that in many of these patent cases, there are a lot of confidential markings in the briefs, and so to the extent that you are concerned about something we might say, we're not going to go through and necessarily make sure that we are censoring ourselves in every place. So if there's something particular that you're concerned about, I think you need to let us know that. When we have that many confidential markings in cases, and they're not all the same, but when we have that many, it's almost impossible to ferret out the issues without stepping on some of those toes. So the first case before the Court is Altair Pharma versus Paragon Biotech. It is an appeal from the Patent Trial and Appeal Board. It is case number 171487. I understand, Mr. Countryman, that you want three minutes for rebuttal? Yes. Okay. You may begin. Thank you, Judge O'Malley, and may it please the Court. Paragon's patent is invalid because it covers a method that patients using Altair's prior art products had been performing for over a decade before the filing date. The only disputed claim limitations dealt with the chiral purity of Altair's prior art products, and Altair presented two independent types of testing, HPLC testing and optical rotation testing, which showed that the prior art products had the required chiral purity. Let's move from the facts to the law for a little bit, okay? Sure. This is the core hangup, and that's that Altair's claim is contingent upon certain events, Paragon's termination of the contract, Altair's resumption of production of the product, and Paragon suing Altair for infringement, right? Yes. So what about Texas v. United States? Well, Your Honor, in this case, the injury is imminent because the 623 patent is blocking Altair if Altair were to want to sell its own phenylephrine product, and Paragon is determined to terminate the contract any day. They've moved in the district court breach of contract action for summary judgment on that. But if the contract's not terminated, then the patent doesn't block, correct? Well, it would still block us, Judge O'Malley. It would still be one barrier to us making our product. The contract also terminates by its own terms in 2021, and so even if Paragon isn't successful in immediately terminating the contract, it certainly will terminate in 2021, and Altair certainly intends to keep selling phenylephrine. I think here the context is important because this is a product that Altair was selling for over a decade before. Beforehand, yeah. Right. And so I think that... As I say, I'm not so interested in the facts. I think the facts are on your side. Yeah, but I think that context is important because it shows that this is a real imminent injury. We have manufacturing facilities. We had distributor networks before the relationship with Paragon, and so it's a different case than when you would have a challenger coming in and saying, well, hypothetically, I have all these intentions, but there's no facts. What is the status of the two district court cases? So with respect to the breach of contract case, motions for summary judgment have been filed, and there's a trial date set for May of 2018. And then with respect to the declaratory judgment... They're cross motions for summary judgment? Cross motions for summary judgment, yes, Your Honor, that are still pending. They've been fully briefed. And then with respect to the patent infringement case, it's currently stayed by agreement of the parties. Paragon's filed some motions to dismiss for various things, and they've also moved to stay, and it's basically stayed. Well, the 256 case, that one stayed? Yes. By agreement of the parties? Yes. I don't really understand that because what possible impact could a PGR have upon inventorship? Well, if the PGR were to invalidate the patent outright, then there wouldn't be any patent left to add. I'll tear it to you. And so our position has always been that the patent is invalid, first and foremost, but that to the extent it is valid, our client should at least be added as a co-inventor or the sole inventor. Assume that we don't believe your reputational injury argument gives you standing, particularly because there is a right to the 256 correction of inventorship action. What is your strongest argument for standing? It's the fact that the patent is blocking us from selling our own product. And some of the case law we cited in the reply belief says that even if it's one barrier to us selling the product, so even if the contract is a separate barrier, the patent still stands as a barrier. And a favorable decision in this PGR appeal would remove that barrier. And so we're suffering an injury. Of course, if the patent blocks us, we can't sell it on our own. That's an economic injury. And that's something that would be addressed in this appeal if we were successful. But my friend on the other side would say that the patent isn't blocking you. The contract is really blocking you. If the contract goes away, then the patent starts blocking you. I think the answer is both are blocking us. Certainly, the contract is one barrier. But the patent is another barrier. If we were to file an ANDA tomorrow, they may or may not have an action for breach of contract. I think we disagree about that. And I actually don't think we think the contract blocks us. But even assuming if we did, the patent would still block us. So if we were to file an ANDA tomorrow, they would still be able to file an infringement suit on the patent. Have you filed an ANDA yet? No. Mr. Countryman, let me ask you. Let's assume that this unfortunate squabble between Altair and Paragon hadn't erupted. And all we had was this contractual relationship based on the May 2011 contract. I assume you would agree, under those circumstances, there would be no standing. I don't, Your Honor, actually, because I think this is a bit unique. Because of the estoppel effect that the PGR was... You'd say there'd be standing simply because of the fact of the existence of the patent and the fact that the contract ends in 2021, is it? Yes, Your Honor. Yes. So the patent doesn't expire until 2033. And so there's definitely going to be a window, even where the contract expires by its own terms, where the patent is going to block us. And here, this is different than the run-of-the-mill declaratory judgment action. Because in those cases, if you dismiss something for lack of standing, it's without prejudice. The person can always come back when the injury is more imminent. But here, this is our only shot to appeal the PGR. And if we don't have that shot, we've got statutory estoppel attaching. Paragon's made a bunch of arguments in the district court that there's collateral estoppel and all these other things. And so I think when you combine the fact that the patent is blocking us with the estoppel... Paragon says, this is all speculative. Nothing's happened. No determination has been made. If they were to stipulate that if the contract was terminated, that they would not sue Altair for infringement of the patent, would that resolve your problems? I think it probably would, Your Honor. I mean, there are some continuations pending. And so we'd be a little bit concerned about that. But I think, for the most part, it would if there were some... They're telling us in their briefs they're nice guys. I'm going to ask that question. Right. I mean, basically, if there were a SuperSAC type covenant, I mean, I think it probably would remove jurisdiction. What if, say, two days from now or Friday of this week, the judge comes down with a ruling on the summary judgment motions, and the ruling contains, among other things, the holding that Paragon does not have the right to terminate the contract, leaving aside what else it may say? How would that change things? I think we would still have standing because it would go back to your first question. We wouldn't have a stronger case, though, certainly. I think it would. I mean, it would remove one of our arguments for standing. But I think we still would have standing, given the fact the contract expires in 2021, which is a couple of years away, but not that far away, and the estoppel effect of this decision. It would seem that given... When did you say the trial date was again? May of 2018. One would think we're, say, maybe two months away from that, that the judge is going to rule on the summary judgment issue probably before too long because he, as like the parties, is facing a trial date. I would assume so, Your Honor. We don't know for sure one way or the other, but I assume we'd see that ruling before the trial. It's... But to get back to the point you were trying to make about the estoppel. So what you're saying is that this context is different because you didn't have to have standing to file the PGR, so there was no testing of your standing at that point in time. And now you're in a different circumstance where if we say you don't have standing to appeal, then there is this bar, this decision that would last forever, presumably. I think that's right, Your Honor. The statute gives us a right to file the PGR without having to show the typical Article 3 things. So yeah, now we're in this position where if we're not allowed to appeal, we have this estoppel, we can't get rid of, and we've lost our only chance. And that's very different than the district court going to file a declaratory judgment in a district court where when they say you don't have standing, it's a dismissal without prejudice and come back later once there is a more immediate dispute between the parties. Getting to the merits, the PTAB really ruled against you because they said you kept making mistakes, right? You didn't submit enough data with respect to one of the testings up front, and then when you really did submit data that they could rely on, it wasn't until you reply. Those are pretty discretionary decisions. How do we say that they abuse their discretion? So a couple of things. I think with respect to both types of testing, there was a key argument or key fact that the PTAB didn't address. So with respect to the HPLC testing, we put in with the petition a control experiment where a sample included both of these two enantiomers, R and S phenylephrine, and we showed that Altair's testing method separated successfully the two enantiomers. That was submitted with our petition. It showed the way the testing was conducted, and it showed most critically that the testing worked for its intended purpose, that it actually did separate the two enantiomers, which was the whole dispute between the parties. The PTAB didn't address that at all. And so we would say that that control experiment establishes beyond doubt the reliability of the testing, but at a minimum, that was critical evidence showing how the testing was conducted and showing that it did actually work for its intended purpose, and the PTAB didn't address it. And so at a minimum, I think the court would need to remand for the PTAB to actually address that control experiment. I would also say, just with respect to the reply evidence, I mean, the APA does give us a right to respond to Paragon's arguments, and we were genuinely surprised that Paragon pretended not to know what types of test parameters we had used. This is information we had given them in advance. They had used it to submit to the FDA to show that the products were chirally pure. And so it came as a surprise to us that they contested it, and then once we did, we immediately submitted the additional evidence with our reply brief. And so I think in that circumstance, it was an abuse of discretion for the PTAB to not consider the reply evidence. But at a minimum, the evidence we submitted with our petition and the control evidence did show that the test was reliable. With respect to the optical rotation testing, here the problem really was that the position Paragon has taken in this proceeding is flatly inconsistent with what it told the patent office. The patent office, in order to approve the party's product, asked Paragon for testing showing the chiral purity of the compound. And the FDA did. And the FDA said, in order for us to continue our evaluation of your NDA, we need either chiral purity testing or we need an explanation of why you're not providing it. Paragon then came to us, asked us for that optical rotation testing. We gave it to them. They gave it to the FDA, and the FDA approved their product. And so in doing that, Paragon was certifying to the FDA, this is reliable. This shows chiral purity. And they got a benefit from that because they got their FDA application approved. Then they come back in this proceeding and take the complete opposite position and say it's not reliable. And that's just flatly inconsistent. PTAB shouldn't have allowed that. Judicial estoppel should have blocked that. Was there anything short of judicial estoppel that they should have at least, indicating that they should have at least considered it as an admission of a party? Absolutely, Your Honor. I mean, at a minimum, and this was argued to the PTAB. In our briefing, we pointed out it was raised at oral argument. And it's nowhere in the PTAB's opinion. So again, we think it's either an admission of a party or judicial estoppel as a matter of law. But at a minimum, there should be a remand for the PTAB to actually address that. Because again, this was the critical argument showing the reliability of that optical rotation testing. And it's nowhere addressed by the board. And that's an abuse of discretion. All right. Yeah, go ahead. Senator, just to get back for a moment just to this standing issue. Is there any merit to the court considering waiting, meaning this court waiting until the district court acts on the summary judgment motion or it gets resolved at trial? Because certainly, that could make the standing issue different, depending how the district court goes. That's certainly an option for the court. I mean, getting back to our earlier exchange, we think they're standing regardless. But at a minimum, certainly, we'd prefer you to wait rather than to dismiss us. I can only speak for myself. But it seems to me it'd be a lot different case on the standing issue if, say, the court were to rule that Paragon does not have the right to terminate the contract. That may or may not be the case. I'm not saying what the merits are on that issue. But it would have an impact on the standing question. Right. I mean, certainly, we think they're standing either way. But yes, I agree. If the court thinks it would be worthwhile to wait, that's certainly an option available to you. I'll save what I have. We'll give you three minutes back. Thank you. May it please the court. As you observed, their whole theory depends on the board having made at least two abuses of discretion and lacking even a mere scintilla of evidence for the factual finding. Let me answer my question I raised with your opposing counsel. The kindest way I can describe your client's position is slalom skiing through gates. I mean, frankly, I look at it as, at best, to borrow a phrase, predatory gotcha. But is Paragon willing to stipulate that if the agreement is terminated, Paragon won't sue Altair for infringement of the 623 patent? It's an assumption. One of the many assumptions that go into that question is that Paragon would even terminate the contract. It's suing for the right to do so. But remember, you can stipulate that it won't terminate. We still have a whole trial to go through on that, Your Honor. Why? Why? Why can't your client do that today in court? If we stipulate that we're not going to terminate, then we could end up in exactly the same position that we've ended up before. The whole reason we sue for breach of contract is because they don't deliver the supply. We depend on Altair. We did not choose this fight. We depend on Altair. We don't make the product. You didn't choose the fight. You got a patent on their product. Your Honor, with respect, that misstates the facts. It doesn't look like that. It looks like it exactly states the facts. So if we assume that this case is about a product, our phenolephrine has been out on the market for a long time. But that's not what this claim is directed to. This claim is directed to a method, a method of use. And the method of use requires a chiral purity at the time of administration. And that's a key difference. Did the client use their testing methods before the FDA? The client did pass through methods that they gave to the FDA, yes. So they relied on those methods. Is that true? It is true that they relied on their data to provide to the FDA. But remember, two very important differences go with that. First, in passing it through, we had no reason to question it because they were the ones doing the test. It's actually represented to the FDA, their test. The second thing is what they were given to the FDA to prove was identity. If you look at the report, it says it's an identity report, not a purity report. And so yes, if you do the test the way they said they did it, it identifies that our phenolephrine is present. No argument on that. But it doesn't meet the protocol for purity. And in fact, I'd love to talk about the judicial estoppel because I actually think it works directly against them. But it is important to remember, we're not saying these tests don't work. You can do these tests correctly. The problem is they have to prove that they did these tests correctly. They did all of these tests in-house. An example would be a bathroom scale. You step on a bathroom scale. You relied on them. But you asked the FDA to rely on them. When the FDA asked us for data, we went to the people who are actually producing the data and said, give us the data. We passed it through. OK. If you want to talk about judicial estoppel, typically judicial estoppel… No, I don't want to talk about judicial estoppel. I want to talk about the facts of the case. And the facts of the case cut your throat, not just against you. I'm sorry you feel that way. I do. OK. So think about what they told the FDA. The FDA said, give us some data. We provided pass-through data. Here, they're trying to use the test for a different purpose. OK. They are trying to use it to prove purity, whereas the test itself, if you look at the document, says it's an identity test. But don't you think it's true that they would be surprised by the fact that the very people who asked them for the test data and who submitted the test data to the FDA would then turn around and say the test data is unreliable? Again, this is different from a typical judicial estoppel, where we take a position and then we change our position. I'm not talking about judicial estoppel right now. I'm talking about whether or not it's fair to say that they were unduly surprised by the position that you took in the PGR. No, no. And the board, again, let's focus. What's before the court is whether the board made a mistake. The board specifically addressed this point. Very specifically addressed this point. Well, the board said it's not judicial estoppel, but they didn't look at the bigger picture. The board actually looked at exactly the question in front of them. They basically said, even if the patent owner does nothing, which is the same. Remember, the burden's all on them. If the patent owner does nothing, they still have to prove their prima facie case. And they said, you didn't do that. But what I'm saying is that then you look to see whether or not it was an abuse of discretion not to allow a reply. The APA allows replies. The patent office, yes, often rejects replies. But just because you have discretion to reject a reply doesn't mean you can't abuse that discretion in appropriate circumstances. I agree, Your Honor. But what the APA requires is the opportunity to put in rebuttal evidence. It doesn't say that the board has to accept it at any time. And it doesn't say that it has to accept evidence that's outside the scope. Right, but the right to exercise discretion goes hand in hand with the notion that that discretion can be abused, right? Right. But the problem on all of these stems from the petition. In fact, I thought it was startling in their opening brief that they say, we know that the institution decision was wrong, and yet we let it go until the end. They even recognized that they had an opportunity to put in supplemental evidence to fix that problem. So first of all, you have to assume they don't give you evidence. You have to assume some sort of evil state of mind that they actually knew what their case was. I don't think we have to assume that. Well, because they put in a case where they tell the board, they give several disconnected statements about what they're doing on the HPLC data. They themselves tell the board that validation is important, but the only time they say their method is validated is in an unsupported attorney statement in the petition. The only time they talk about validation, they point to the USP standards. So the board made the generous assumption, piecing all of this together, that the USP standards were being used. They tried to say we misled the board. We were reading the same thing the board was. When you sought the patent and you claimed that chiral purity, what testing methods did you use to make sure that you properly had the invention? Again, we have no problem with the test that it's possible to do the test correctly. Yes, we use very similar tests because that's how you prove it. You use the same tests, right? Well, that's an issue in dispute because they didn't get the protocols in the petition. You did testing separate and independent from the testing that they had given you? Yes. But you're saying, but you did the same test methodology. Same general methodology, yes. Because again, it's not that the test doesn't work. It's just like a bathroom scale work. But if you don't zero it, you'll get the wrong result. And scales can fail. So it's good to test it against a known weight periodically. They have the burden of proof. They're the ones. In their opening in Mr. Sawai's declaration, his first declaration, even though he didn't qualify as an expert, he makes a big point that validation is important. If you don't validate it, it doesn't count. The only thing they say about validation has no evidentiary support in the petition. Am I pronouncing it right? Torzhan? I say Torzhan, your honor. How do you say it? The CZ is a TS. All right. I want to make sure I had that right. Two questions. One, what is your response to the question that I asked Mr. Countryman about a weighting or a suspension of proceedings? Waiting to see what the district court in Brooklyn does on this contract case. Because that would, I think we can agree, without saying which way it would go, affect how one looks, possibly affect how one looks at the standing issue. I think it could. There's still assumptions that get built in, but it could affect that. I guess my concern would be that I would sort of be putting the thumb on the scale at that point, right? Because they had an obligation to establish jurisdiction at the time they filed. If that is the only way they have jurisdiction, essentially that concedes that they didn't at the time. So while I suspect that the court has the discretion to do that, I'm not even sure about that. But it certainly seems like the court would be actively taking a position. Second question I have is this. Leaving aside the fact that the patent is out there, what is it in the contract that's in dispute that bars Altair from selling its product that it manufactures to anybody else? Well, there are exclusivity provisions, is my understanding of the contract. I saw exclusivity provisions, but I didn't necessarily, maybe I'm not reading it correctly, but I didn't see anything in there. There is exclusivity, so you'll sell, you have the exclusive contract with us, Paragon, but you're saying the provisions in the contract operate to bar Altair from selling to anyone else besides Paragon, leaving aside a possible patent infringement issue. Yes, Your Honor, that's our understanding. That's your contention? Yes. I understand the 256 issue was not before us, but assuming that your patent would read on their product, a product that they had been distributing and the details of which they gave to you, how could you possibly be listed as the sole inventors? Okay, let me unpack that question a little bit. I do actually think the 256 question is an interesting one, but the claim is not to a purity at a certain point. They have argued very, very clearly they don't even think a problem exists, much less that we solved it. One of the things an inventor has to do is have conception of the invention. They deny that an invention even exists. It's hard to see how they could be an inventor even as they say no invention exists. The patent office clearly disagreed with them. The invention is taking the steps to make sure that at the point of administration you get chiral purity. The reason for this is because we were the first ones to realize that a degradation product is not simply just an inactive ingredient, but is actually a problem in the system. We're the ones who identified that at the time of administration, not at the time of administration, you have to have a chiral purity level. That's the basis of the patent. That's what the claims say. If you have chiral purity below that level, you're not infringing. It's a different... It was just serendipitous that they had keep refrigerated on their box. No, there are lots of reasons why you might want to keep it refrigerated. However, I will point out this is another glaring inconsistency throughout their case. One of the problems with a lot of their data is they rely on samples that were never refrigerated. Their position throughout has been from the petition all the way through the oral argument that the board has been temperature doesn't matter. If temperature doesn't matter, there's no guarantee that any of the handling on the product has been correct. The whole point of their case is essentially an inherency case that you will necessarily always have this purity level, and yet they've simultaneously told you that there's absolutely no reason in their opinion why you have to handle it that way. So what the patent says is we've shown you that if you keep it cold, you can maintain this purity level. They've told you that temperature is absolutely not even an issue, and that's why you can rely on some of their test data. That's why they don't have to tell you whether their standard was properly handled. And they want you to give them both sides of the assumption, and that's just not possible. I mean, technically, either temperature matters or it doesn't. And they still aren't making a decision. I mean, frankly, an appeals court argument is not the time to be pleading in the alternative, and that's exactly what you're getting here. I would also point out, though, just in terms of the standing issue, one of the issues in the declaratory judgment action also is whether they have an inventorship. And, of course, if they prevail on that point, that would also give them rights regardless of whether or not the patent, or even if the patent is valid. So that's an additional consideration. Okay. Anything else? All right. Thank you. You have three minutes. Thank you. Mr. Countryman, sorry to jump right on you like this, but as we know, time is fleeting here. I have two questions, please. Opposing counsel has said that the contract bars Altair from selling its product to anyone else. Is that correct? I think we agree with that, Your Honor. Yes. Second question. If I could make a caveat, we don't agree that it would bar us from filing an ANDA, and so that's a distinction that's important. The other question that I have is, do you agree that if, assume for the moment, the 623 patent is valid, you go out and sell your product, is it your position that you are then infringing your client is then infringing the patent? Yes. That's our position, because it's the same product we've always sold. We say the prior art was covered by the patent, and so if we were to sell it— What's your response to the fact that they claim that this is a method patent and not a product? So it is a method, but our prior art products practiced that method, because they were labeled to, say, refrigerate them, and they had the chiral purity limitations. As the data, the HPLC data and the optical rotation data that Paragon submitted to the FDA to get approval showed. So yes, it's a method claim, but our prior products practiced that method, because all the method was was the product plus chiral purity, which the data showed, plus refrigeration, which our product was labeled to have. Meaning the products you sold necessarily resulted in your customers practicing the method. Correct, Your Honor. Or you practicing the method during testing. Correct. So you would be on the hook, in your view, I guess, for, say, contributory infringement or induced infringement. Correct. Not direct infringement. Correct, Your Honor. Correct. And certainly, I think the filing of the ANDO would trigger a lawsuit. Oh, yeah. Leaving that aside for the moment, yeah. Because we would have to file the ANDO if we wanted to keep selling the product. Just a couple points. First, the distinction counsel was making on purity and identity. The FDA, at Appendix 773, asked them to consider adding a chiral purity test to the specification, and they responded by submitting the optical rotation data we gave them. So this purity versus identity distinction has no basis, because they told the FDA that the test measured purity. Just institution, the board thought the optical rotation data was sufficient in institution, and it was only after Paragon argued against it, contrary to what they told the FDA, the board rejected it. And so here, they should have been prevented from doing that, and had they done that, the board necessarily would have... But at the least, you wanted to hear affidavit. Agreed. Agreed, Your Honor. And finally, if I could just say one thing. One brief thing. The testing that we did use, it is exactly the same as what was in their patent. And you can see that by comparing Column 11, where it shows the HPLC conditions with Appendix 1509, and Column 4, where it talks about the exact same type of optical rotation testing we did here. Okay. Thank you. Thank you.